UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

In re: BRUCE J. BRIGGS,

                              Debtor.

--------------------------------------------------------

ALBERT J. BROUSSEAU,

                              Plaintiff-Appellant,

       v.

BRUCE J. BRIGGS,

                              Defendant-Appellee.

**DECISION AND ORDER**
11-CV-73A

---

## I.    INTRODUCTION

Pending before the Court is an appeal by plaintiff-appellant Albert J. Brousseau ("Brousseau") of an Order of the United States Bankruptcy Court for the Western District of New York (Kaplan, *J.*) filed on December 10, 2010 (the "Bankruptcy Order"). In the Bankruptcy Order, the Bankruptcy Court held that a state-court lawsuit that Brousseau filed against defendant-appellee Bruce J. Briggs ("Briggs") violated a Chapter 7 bankruptcy discharge that Briggs had obtained. Specifically, the Bankruptcy Court ruled that Brousseau's attempt to collect unpaid wages and benefits from Briggs's corporation by suing Briggs personally, pursuant to New York Business Corporation Law ("BCL") § 630(a), violated the bankruptcy discharge because Briggs's liability under that statute

existed before he filed his bankruptcy petition. On appeal pursuant to 28 U.S.C. § 158(a)(1), Brousseau asks this Court to reverse the Bankruptcy Court and rule that BCL § 630(a) liability does not exist for bankruptcy purposes until attempts to collect against the corporation have failed.

The Court held oral argument on May 12, 2011. For the reasons below, the Court affirms the Bankruptcy Order.

## II.   BACKGROUND

This case concerns Brousseau's attempt to collect unpaid wages and benefits from his former employer. In November 2007, Brousseau began to work as a sales representative for Summit Wholesale, Inc. ("Summit"), a corporation in LeRoy, New York that sold fireplaces, mantels, and outdoor grills.[1] Briggs was a 100% shareholder of Summit for Summit's entire existence. From November 2007 to May 2008, Brousseau earned sales commissions, bonuses, and vacation pay that Summit had agreed to pay him. Brousseau also incurred costs as part of his job that Summit had agreed to reimburse.

The central event giving rise to this case occurred in June 2008, when Summit "became defunct." The record does not clarify what "defunct" means; at oral argument, the parties indicated that, to their best knowledge, Summit never went through formal bankruptcy proceedings. In any event, Summit appears to

---

[1] The Court takes judicial notice that the New York Department of State website lists Summit as a domestic business corporation that filed with the state on September 8, 1987 and has 200 shares of zero par value.

have ceased operations—and stopped paying its financial obligations—in June 2008. Summit ceased operations without ever paying Brousseau what it owed him.

On August 29, 2008, meanwhile, Briggs filed a Chapter 7 petition for himself before the Bankruptcy Court. (*See* Bankruptcy Court Case No. 08-14085.) Schedule F of Briggs's bankruptcy petition listed creditors holding unsecured non-priority claims. In Schedule F, Briggs included Brousseau as an unsecured creditor in the amount of $29,665 for a "Business debt for Summit Wholesale, expenses & commission."[2] (*Id.* Dkt. No. 1 at 21.) Brousseau received notices of the Bankruptcy Court's meetings of creditors held on September 25, 2008 and November 4, 2008. (*Id.* Dkt. No. 5 at 3; Dkt. No. 14-1 at 3.) Brousseau admits receiving notice of Briggs's bankruptcy petition but says that he did not litigate any claim in the Bankruptcy Court because he thought that he had no claim versus Briggs then. On January 15, 2009, the Bankruptcy Court granted Briggs a discharge under 11 U.S.C. § 727. (*Id.* Dkt. No. 36.) Brousseau received notice of this discharge. (*Id.* at 3.)

Once Brousseau suspected that Summit never would pay the money that it owed him, he decided to bring suit in state court. On October 9, 2008, Brousseau

---

[2] Briggs listed that he incurred this obligation in 2003, but the parties acknowledged at oral argument that Briggs made a typographical error. Briggs in fact incurred the obligation in 2008. This obligation is the unpaid money that Summit owed Brousseau.

filed a complaint against Summit in New York State Supreme Court, Columbia County, where he lived. In the complaint, Brousseau requested a total of $33,837.14 in damages for unpaid commissions, bonuses, vacation pay, and expenses; Brousseau also sought attorney fees and liquidated damages to the extent permitted under New York's Labor Law. Summit never appeared in that action. On March 3, 2009, the state court entered default judgment against Summit in the amount of $42,428.14, which covered unpaid obligations, liquidated damages, filing costs, and attorney fees. The state court also awarded post-judgment interest. On April 2, 2009, Brousseau served Summit with a Notice of Entry of the default judgment. At various times throughout 2009, Brousseau tried to satisfy the judgment against Summit but failed. On February 5, 2010, Brousseau forwarded the default judgment to the Genesee County Sheriff's Office for execution under New York law. On April 14, 2010, the Genesee County Sheriff's Office returned the execution papers to Brousseau unsatisfied.

The failure to satisfy the default judgment against Summit gave rise to the next major event in this case, Brousseau's attempt to pursue Briggs personally for the money that Summit owed him. On June 11, 2010, after serving the notice required under BCL § 630(a), Brousseau sued Briggs individually in New York State Supreme Court, Columbia County. In that action, Brousseau invoked BCL § 630(a) and its provision creating joint and several, personal liability for wages

against any corporation's 10 largest shareholders.  During the summer of 2010, Brousseau and Briggs corresponded with each other about whether BCL § 630(a) allowed Brousseau to reach Briggs in light of Briggs's bankruptcy discharge.  Briggs took the position that his bankruptcy discharge eliminated Brousseau's claim because the claim existed before he filed his Chapter 7 petition.  The parties could not reach a consensus on the matter.  On August 26, 2010, Briggs filed a motion in the Bankruptcy Court for a finding of contempt against Brousseau for violating the automatic stay that his bankruptcy imposed on any collateral litigation.  On October 27, 2010, the Bankruptcy Court granted the motion from the bench and dismissed Brousseau's claim against Briggs as a pre-petition claim barred by Briggs's final discharge.  On December 10, 2010, the Bankruptcy Court issued a final order—the Bankruptcy Order—memorializing the October 27 dismissal of Brousseau's claim against Briggs.  The Bankruptcy Order is the order from which Brousseau now appeals.

This appeal presents one preliminary question and one substantive question that the Court must resolve.  The preliminary question is whether Brousseau's failure to litigate his claim in the Bankruptcy Court—a claim that Briggs thought that he personally owed Brousseau, even if Brousseau thought otherwise—foreclosed any attempt to litigate that same claim post-discharge.  The substantive question is whether Brousseau's claim constitutes a pre-petition claim barred by Briggs's bankruptcy discharge.  Brousseau argues that his claim

is a post-petition claim that did not arise until April 14, 2010, when the Genesee County Sheriff returned the default judgment against Summit unsatisfied. According to Brousseau, he could not invoke BCL § 630(a) to litigate against Briggs until then, which was over a year after Briggs's discharge. In support of his argument, Brousseau relies principally on *Pension Benefit Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154 (2d Cir. 2009). Briggs counters that Brousseau's claim against him constitutes a pre-petition claim because the contingent liability for Summit's debts arose before he filed for bankruptcy. According to Briggs, he always was the 100% shareholder of Summit and always knew that BCL § 630(a) potentially would make him liable for any of Summit's unpaid debts. In effect, Briggs argues, this situation is analogous to that of a co-signer of a loan or of a party to an indemnity agreement. As part of that analogy, Briggs relies principally on *Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.)*, 209 F.3d 125 (2d Cir. 2000).

## III.   DISCUSSION

### A.   *Effect of Bankruptcy Notice and Discharge*

As a preliminary matter, the Court will address Brousseau's decision not to litigate his claim during Briggs's bankruptcy proceedings, even though he had full notice of those proceedings. At oral argument, Brousseau attempted to excuse his decision by using his principal argument that his claim against Briggs is a post-petition claim. According to Brousseau, he never litigated his claim during

the bankruptcy proceedings because in his mind, he had no claim against Briggs then.  This argument overlooks Briggs's decision to make Brousseau's claim part of the bankruptcy proceedings regardless of what Brousseau may have thought about his own claim.  Briggs listed Brousseau's claim in Schedule F of his bankruptcy petition.  Brousseau had notice of that listing and of other proceedings occurring in the Bankruptcy Court.  Brousseau never appeared to file proof of his claim, or to argue that he had the right to pursue the claim post-discharge.

As a result of Briggs's inclusion of Brousseau's claim in his bankruptcy petition and Brousseau's failure to do anything about it, Brousseau's claim does not escape the general discharge that Briggs received.  "Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title."  11 U.S.C. § 727(b).  Section 523 (11 U.S.C. § 523) does not apply here because it provides exceptions to a discharge only for instances of fraud or of debts that cannot be discharged as a matter of law.  Briggs himself acknowledged that his debt to Brousseau arose before he filed his petition.  Brousseau never argued otherwise

before the Bankruptcy Court.  The Bankruptcy Court never disallowed Brousseau's claim.  Under these circumstances, 11 U.S.C. § 727(b) operates to bar Brousseau from pursuing his claim after having an opportunity to do so during Briggs's bankruptcy proceedings.  To hold otherwise would mean that Brousseau could postpone the deadlines and procedures of the Bankruptcy Court indefinitely, until he felt personally ready to pursue his claim.  The Court thus affirms the Bankruptcy Order even before reaching the substantive question that Brousseau raises under BCL § 630(a).

**B.     *BCL § 630(a) Liability as a Pre-petition Claim***

In the alternative, the Court will assume that Brousseau's claim is not procedurally barred and will assess whether it constitutes a pre-petition claim. "The term 'claim' means . . . right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).  "Whether a claim exists is determined by bankruptcy law, while the time a claim arises is determined under relevant non-bankruptcy law." *Manville*, 209 F.3d at 128 (citation omitted).  Here, Brousseau's claim arose between November 2007 and May 2008, when he earned commissions and bonuses and incurred costs that Summit had to pay.  The accrual of those financial obligations had two consequences.  First, Summit was immediately and directly liable for those obligations as Brousseau's employer.  Summit's direct

liability allowed Brousseau to sue it a few months later in state court.

Second, and crucial to this case, Briggs was immediately and indirectly liable for the same financial obligations under state law. "The ten largest shareholders . . . of every [unlisted] corporation . . . shall jointly and severally be personally liable for all debts, wages or salaries due and owing to any of its laborers, servants or employees other than contractors, for services performed by them for such corporation." BCL § 630(a). The plain language of BCL § 630(a) does not set any conditions for when a shareholder's personal liability arises. Personal liability arises instantaneously as soon as a corporation incurs a financial obligation described in the statute. *Cf. Sasso v. Vachris*, 484 N.E.2d 1359, 1360–61 (N.Y. 1985) (describing BCL § 630(a) as an "enforcement mechanism" that "was designed to remedy precisely the default which is alleged in this litigation and to provide a safeguard for employees who would otherwise be left without recourse in the event of the corporation's insolvency. That purpose is achieved by creating a civil cause of action in favor of employees providing them with an additional remedy or enforcement mechanism, not otherwise available, by which they may recover delinquent contributions determined to be 'due and owing' by the corporate employer.") (citations omitted). Thus, Briggs's personal liability under BCL § 630(a) came into being in November 2007 and increased between then and May 2008 as Brousseau continued to work. Brousseau is correct that he could not enforce Briggs's personal liability

right away, because he first had to exhaust his judicial remedy against Summit. *See* BCL § 630(a) ("An action to *enforce such liability* shall be commenced within ninety days after the return of an execution unsatisfied against the corporation upon a judgment recovered against it for such services.") (emphasis added). When Briggs's personal liability could be enforced, however, is not the same as when it arose.  Under the plain language of BCL § 630(a), Briggs's personal liability arose months before he filed his bankruptcy petition on August 29, 2008. At most, Brousseau's inability to enforce Briggs's liability before April 14, 2010, when the execution against Summit returned unsatisfied, might have made it a contingent liability under the Bankruptcy Code.  Under 11 U.S.C. § 101(5)(A), though, a contingent liability is as much a claim as any other.  *Cf. Manville*, 209 F.3d at 129–130 ("The fact that the contingency in this case . . . materialized post-petition does not transmogrify the claim into a post-petition claim, but merely means that the contingent claim moved closer to becoming liquidated upon the happening of that contingency.") (citation omitted).  Combining these circumstances with the notice that Briggs gave Brousseau when he filed his bankruptcy petition, Brousseau was fully on notice by late August 2008 that the Bankruptcy Court would soon adjudicate a personal liability that Briggs incurred months earlier.  Brousseau's claim against Briggs thus constitutes a pre-petition claim that Briggs's discharge eliminated.

Although Brousseau relies heavily on *Oneida* to advance his argument, that case does not warrant a different conclusion from what the Court has reached.  In *Oneida*, the financial liability in question did not arise as a matter of law until after the corporate debtor was discharged from its Chapter 11 reorganization proceedings.  *See Oneida*, 562 F.3d at 157 ("Here, the substantive, non-bankruptcy law giving rise to Oneida's obligation to pay a Termination Premium is the Special Rule, which unambiguously states that where a pension plan is terminated in connection with an employer's bankruptcy reorganization, the General Rule—which creates the [Pension Benefit Guaranty Corporation]'s right to a Termination Premium—'shall not apply to such plan until the date of the discharge or dismissal of [the employer].'") (second alteration in the original) (citation omitted).  Unlike in the present case, the financial liability in *Oneida* was not a liability that arose pre-petition and simply could not be enforced until later; it did not exist at all until the end of the bankruptcy proceedings.  *See id.* ("This, then, is not a situation, as the bankruptcy court erroneously thought, where an obligation has already been created prior to bankruptcy but is subject to a contingency.  Rather, an employer's obligation to pay a Termination Premium on a pension plan that is terminated during the course of the bankruptcy does not even arise until the bankruptcy itself is terminated.  No matter how broadly the term 'claim' is construed, it cannot extend to a right to payment that does not yet

exist under federal law.") (citation omitted). *Oneida* thus addresses a different factual scenario that does not affect the outcome of this appeal.

## IV. CONCLUSION

For all of the foregoing reasons, the Court affirms the Bankruptcy Order. The Clerk of the Court shall close this case.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: June 16, 2011